IN THE CIRCUIT COURT OF THE UNTIED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

**UNITED STATES OF AMERICA,**   *

**VS.**                         *      CASE NO. 3:06-CR-150-MHT

**EARNEST PIPPIN.**             *

**ATTORNEY'S RESPONSE TO DEFENDANT'S
CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL**

**Comes now** the undersigned attorney who represented the Defendant, Earnest Pippin, and does respond to the Defendant's claim of ineffective assistance of counsel as follows:

**Providing Information to the Defendant**

1. IN PERSON COMMUNICATIONS

On four occasions I met with Mr. Pippin in the Montgomery County Jail. Each time we were given a small room to meet in and I was there for no less than an hour on each occasion. I fully explained to Mr. Pippin each and every allegations against him and all possible defenses available to him. Mr. Pippin's Federal Probation Officer met with Mr. Pippin and myself and I made sure that Mr. Pippin understood how each of his prior offenses would effect the sentencing guidelines. There was at least two charges the Probation Officer had found for an Ernest Pippin which Mr. Pippin denied pertained to him. The Probation officer discussed with myself and Mr. Pippin that if he could not substantiate those charges were actually against Mr. Pippin he would not use them for guideline calculations. Those charges could not be directly attributed to my client and were not used in the calculation of the sentencing guidelines. I meet with Mr. Pippin for 45 minutes before the Probation

Officer arrived and one hour afterward.

On each visit Mr. Pippin and I would discuss what he had done, how the elements the prosecution had to prove could be proven and what the range of punishment could be for Mr. Pippin. We also discussed what he wanted me to do to prepare his wife for his pending imprisonment. At no additional charge to Mr. Pippin or his wife, Eugena, I contacted the person who had done work to the roof of their mobile home and I was able to have them return and fix the roof properly.

I met with Mrs. Eugena Pippin in my office on five occasions. Each time I answered all of her questions. She told me Mr. Pippin was calling her and she would come and ask me questions that he had come up with. I answered each question and she said she would give him the answers to the questions the next time she saw or spoke to him. I know he was getting those responses because he would ask follow up questions to the ones she had asked when he and I met. Since I had signed up for the Federal Prison Telephone Collect Call Acceptance Program Mr. Pippin could call me whenever he was allowed to use the telephone. I told Mrs. Pippin each time we met that if Mr. Pippin had any questions he could call me or I would discuss them with him when I went to see him.

Prior to the date of sentencing I met with Mr. Pippin and he understood that through my discussions with the Prosecutor and Probation Services they were offering a plea deal less than the minimums set forth by the sentencing guidelines. He indicated to me that he understood that fact and was glad that he had a chance to get less than the guidelines set as a minimum.

Mr. Pippin called me and said he wanted to file an appeal. I went and met with him in Montgomery and I explained to him that the Judge had almost refused to accept the deal I had made with the prosecutor because it was below the minimum guideline amounts. In fact this Honorable Court stopped Mr. Pippins sentencing hearing to consider if the Court was going to agree with the plea

agreement or if the Court was going to sentence him to more than the minimum guidelines suggested. I informed Mr. Pippin that if he was successful in getting his plea rescinded he would then have to stand trial. With the overwhelming evidence held by the Prosecution I informed him that a guilty verdict was the most likely outcome to his trial. I also asked him to consider the fact that the Judge had almost refused the 15 year deal to give him more time then the minium guidelines suggested. Therefore, I told him that if convicted he would certainly get far more time then the plea bargain I had gotten for him. He understand the risk of winning an appeal, which I had already told him he would most likely not do anyway. Mr. Pippin agreed with me at that meeting that he did not want to appeal and risk losing the deal he had. Mr. Pippin then called me a few days later and said he had changed his mind and wanted to see if he could get the sentence set aside and for me to see if I could get him 10 years. Again, I informed Mr. Pippin that I did not see any grounds for the Court to rescind his sentence and that by doing so he ran the risk of being sentenced to far more than 15 years. Mr. Pippin agreed that it was not in his best interest to appeal and that is how the conversation ended.

  During each of our face to face meetings I answered all of Mr. Pippins questions and provided him with documents, the sentencing guidelines, pleadings, etc. Mr. Pippin always had a yellow pad with him or I provided him with one. He took notes at each meeting. When I would leave Mr. Pippin would ask me to take most the documents back with me because he did not want other prisoners to see what he was charged with. He feared they would physically harm him if they saw the pleadings, charges, etc.

  I not only meet with Mr. Pippin I meet with his wife, Eugena, on at least six occasions. Three were set appointments and she would just drop by my office and ask to see me without an appointment. I met with her each time she came by and I would fully discuss with her everything I had discussed with Mr. Pippin.

I also met with Mr. Pippin's sisters who came to my office to discuss his situation. On one occasion two of his older sisters met with me in my office. I believe Mr. Pippin has a total of five sisters. I met with his younger sister on two occasions at my office. The younger sister wanted their father's guns returned. Again, without any extra cost or expense to Mr. Pippin I filed the necessary documents to get the long guns returned and I spoke with the prosecutor and federal marshal's service to get those guns returned.

During evaluation of the case and in attempting to get a plea arrangement from the Federal Prosecutor's office. I went to the Federal Probations Services office and met with Mr. Pippin's initial officer, her supervisor and then his current probation officer. I discussed with them sentencing guidelines and Mr. Pippins history. I met with the Federal Prosecutor in Montgomery to discuss their case and any evidence they had against Mr. Pippin. We also discussed how they would prove the children's age. I then met with Mr. Pippin and explained in great detail to him the fact that the children in the photos were identifiable by the Prosecution and that plans had been made to have enough of them appear that the prosecution's burden of proving the element of the children's age could be easily established.

2. TELEPHONIC COMMUNICATIONS

As I set forth above I paid for and registered with the company who provides the long distance service for prisoners. Mr. Pippin called my office on many occasions and we would discuss everything from elements and evidence in his case to something his wife needed fixed or repaired. Mrs. Pippin would call me on a regular basis. Usually she would call me after I had met with Mr. Pippin or spoken to him on the phone. She would inform me that Mr. Pippin had just spoken to her and she would tell me things Mr. Pippin accredited to me which I did not say. Clearly, Mr. Pippin was trying to give his wife a

different view of his situation then I was discussing with him. He was leading her to believe that he would not get more then 10 years and would probably be on probation. He and I never discussed such an arrangement due to the fact that it was far below the guidelines.

I spoke to three of his sisters by phone and each of them had spoken to him and then called me to what they needed to do to help. I had each appear to support him at sentencing.

I spoke to the Federal Prosecutors office to discuss the facts they had and the evidence they would produce at trial. We also discussed a plea agreement on at least 5 occasions. I also spoke to Probation Services by telephone on two occasions in regard to the sentencing guidelines and twice with his current probation officer in regards to Mr. Pippin's criminal history and Mr. Pippin's interview with the Probation officer.

### 3. RESULTS

Mr. Pippin was facing an extremely long federal prison sentence when I got into the case. I met with him on a regular basis. We discussed the facts of the case and I explained to him each and every defensive tactic we could attempt both prior to trial and at trial. I explained to him the Prosecution's case. I explained the strengths and weaknesses in their case. I explained to him the elements they would have to prove and the level of the burden of proof. I explained to him the interview process with the Probation officer. I explained the sentencing guidelines and how his past criminal record would come into play with those guidelines. During the meeting with Mr. Pippin and his probation officer I had the probation officer explain, at length, to Mr. Pippin what information was considered to calculate the guidelines and how the guidelines worked.

At sentencing Probation Services recommended that the minimum guidelines be followed. I had

worked out a plea arrangement for Mr. Pippin which was below the minimum guidelines. In fact, this Honorable Court asked the prosecution why they had agreed to deviate from the minimum number of months in the guidelines. The Court even stopped the plea and said it would have to think about going along with the plea deal. The Court accepted the plea deal but informed Mr. Pippin that the Court had considered giving Mr. Pippin far above the minimum guidelines and would have had the matter gone to trial.

Therefore, I believe I was able to obtain a good, fair and reasonable outcome for Mr. Pippin. An outcome which he was involved with and understood each and every step of the way.

### 4. MR. PIPPIN"S DEFENSES

Mr. Pippin's defenses, which he mentions he never got to set forth in Court, were that he didn't actually hurt anybody and that he never approached a child in real life. In fact, during the phase of sentencing when the Court asked if I had anything to say as to the sentencing I started to discuss the fact that Mr. Pippin had never made any contact with any of the children and the Court, rightfully, let me know that such an excuse did not mitigate what Mr. Pippin was doing or the damages caused to the children in the pictures.

### **CONCLUSION**

I provided to Mr. Pippin a full and total defense. One in which he was involved in every step of the way. Unfortunately, Mr. Pippin had "buyer's remorse" after pleading and being sentenced. Even though he had gotten sentenced to less months than the minimum set forth in the Federal Sentencing Guidelines and clearly far less than the Court would have given him had he been convicted. I have explained to Mr. Pippin

that if he is successful in getting his plea overturned he still must go to trial against overwhelming odds. I also informed him that if he gets found guilty at trial his sentence will be no where near the leniency he was allowed under the plea bargain. This is clearly a case of "you better be careful of what you ask for because you might just get it." If Mr. Pippin wins his appeal he will certainly not be happy with the ultimate results of his actions.

If I can provide any further information to the Court please let me know and I will be glad to do so.

Respectfully Submitted,

/s/ Walter M. Northcutt
Walter M. Northcutt
Attorney at Law
323 Thach Ave.
Auburn, AL. 36830
334-826-0944
NOR027

**CERTIFICATE OF SERVICE**

The undersigned does certify that a true copy of this Attorney's Response to Defendant's Claim of Ineffective Assistance of Counsel was served upon the Defendant and Federal Prosecutors Office by means of electronic filing.

Done this the 19th day of July, 2007.

/s/ Walter M. Northcutt
Walter M. Northcutt